UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

-------------------------------X
CELESTINO P. MONCLOVA and DARRELL
RAMOS,

       Plaintiffs,

   -against-

CITY OF NEW YORK; NEW YORK CITY
DEPARTMENT OF CORRECTION; ANNA M.
KROSS CENTER; BRIAN RIORDAN,
WARDEN FOR THE ANNA M. KROSS
CENTER; EDMOND DUFFY, DEPUTY
WARDEN OF PROGRAMS; and JOAN
DAVIS, DEPUTY WARDEN OF
ADMINISTRATION,

       Defendants.

-------------------------------X

<u>MEMORANDUM AND ORDER</u>

Civil Action No.
CV-05-3164 (DGT)

Trager, J:

    <u>Pro se</u> plaintiffs Celestino P. Monclova ("Monclova") and

Darrell Ramos ("Ramos") (collectively "plaintiffs") bring this

lawsuit against the City of New York ("City"); the New York City

Department of Correction ("DOC"); the Anna M. Kross Center

("AMKC"); Brian Riordan, Warden for the Anna M. Kross Center

("Riordan"); Edmond Duffy, Deputy Warden of Programs ("Duffy");

and JoAndrea Davis, Deputy Warden of Administration ("Davis")[1]

(collectively "defendants").  Plaintiffs are bringing claims

pursuant to Title VII of the Civil Rights Act of 1964, 42 U.S.C.

§ 2000e-3(a) et seq. ("Title VII"), and 42 U.S.C. § 1983

---

    [1] Defendant JoAndrea Davis was named as "Joan" Davis in
plaintiffs' complaint and subsequent case captions.

("§ 1983").  Plaintiffs allege that defendants refused to transfer them to more favorable work conditions and issued disciplinary charges against them in retaliation for plaintiffs' opposition to unlawful employment practices.  Compl. ¶ 2. Plaintiffs seek to expunge their disciplinary records, to be reassigned to a "low classification area" and punitive damages.

Defendants move for summary judgment pursuant to Federal Rule of Civil Procedure 56, arguing that: (1) plaintiffs cannot establish a prima facie case of retaliation because they did not suffer any materially adverse actions, and there is no causal connection between plaintiffs' protected activity and any allegedly adverse actions; (2) all claims under § 1983 should be dismissed because plaintiffs fail to allege that they suffered a constitutional violation, and in any event all claims against DOC should be dismissed because plaintiffs cannot show that any alleged violations were caused by an official policy or practice; (3) individual defendants Riordan, Duffy and Davis are entitled to qualified immunity against any § 1983 claims; and (4) individual Title VII claims against Riordan, Duffy and Davis must be dismissed because Title VII only provides a cause of action against the entity employing plaintiffs.

As explained below, plaintiffs fail to make out a prima facie case of retaliation under Title VII or § 1983.  Therefore, defendants are entitled to summary judgment on all claims.

**Plaintiffs' Prior Suits Alleging Unlawful Employment Practices**

Plaintiffs are correction officers employed by the DOC. Both men work at the AMKC, a DOC facility located on Rikers Island. Monclova began working for the DOC in or around June 2001, and the AMKC was his first assignment. Defs.' Statement of Undisputed Facts Pursuant to Local Rule 56.1 ("Rule 56.1 Statement") ¶ 2. Ramos began his employment as a correction officer in or around July 2002. Id. ¶ 3.

In July 2004, Monclova sued the DOC claiming that he was dismissed from specialized training for the DOC's Emergency Services Unit because of his race and veteran status. See Monclova v. N.Y. City Dep't of Corr., No. CV-04-3026 (DGT) (E.D.N.Y. dismissed Aug. 8, 2007) ("Monclova I"), Compl. ¶ 1.[2] On August 8, 2007, Monclova's suit was dismissed for failure to prosecute.

In January 2005, Ramos sued the DOC claiming that the DOC discriminated against him because of his race by (1) firing him, (2) refusing to give him back pay after he was reinstated and (3) refusing to permit him to be firearm qualified. Ramos v.

---

[2] The Monclova I complaint is attached as Exhibit B to the Declaration of Jonathan Bardavid in Support of Defendants' Motion for Summary Judgment, dated Dec. 15, 2006 (hereinafter "Bardavid Decl.").

N.Y. City Dep't of Corr., No. CV-05-0223 (JFB), 2006 WL 1120631,
at *1 (E.D.N.Y. Apr. 26, 2006).  In August 2006, Ramos's
complaint was dismissed for being time-barred and for failing to
state a claim upon which relief could be granted.  Ramos v. N.Y.
City Dep't of Corr., No. CV-05-0223 (JFB), 2006 WL 2355839, at
*4-5 (E.D.N.Y. Aug. 14, 2006).


### (2)

### Plaintiffs' Work Assignments and Transfer Requests

Ramos began work at the AMKC in or about September 2003.
After arriving at AMKC, Ramos posted a request for a steady tour
of duty.  Deposition of Darrell Ramos, dated Mar. 3, 2006 ("Ramos
Dep."), at 64.  According to Ramos, the alternative to a steady
tour of duty was to be given assignments "on the wheel," which
meant that he could be assigned anywhere within the AMKC and that
his shift hours could change.[3]  Id.  Ramos requested to work in
the Module Eleven housing area, and this assignment was granted
in December 2003.  Id. at 67.  Ramos was initially pleased when

---

[3] Monclova similarly explained that working "on the wheel"
meant that a correction officer would rotate through different
work areas and different time shifts, instead of being assigned
to a steady post.  Deposition of Celestino Monclova, dated Mar.
14, 2006, at 68.  According to Monclova, a correction officer
without a steady post would "usually . . . prefer to be on the
wheel," because this would allow him to balance 3 p.m. to 11 p.m.
shifts (when inmates are most difficult to control) with late
night and early morning shifts (when inmates are generally asleep
and easier to control).  Id. at 68-69.

his request to post to a Module Eleven shift was granted.  <u>Id.</u> at
68.  Ramos now alleges that Module Eleven is what he calls a
"high classification area" that houses the "most violent and
aggressive" DOC inmates.  Compl. ¶ 1.  Ramos, however, was aware
of the nature of Module Eleven when he requested to be assigned
there.  Ramos Dep. at 67-68.

As noted, Monclova first began work at AMKC in June 2001.
According to plaintiffs, Monclova has been assigned only in
unspecified "high classification" areas since he was dismissed
from a prior housing area posting in December 2003.  Compl. ¶ 3.
Plaintiffs also state that Monclova was "badly injured in one of
those Housing Areas (Module 11)," but that upon his return to
work in April 2004 Monclova "was told by his Personnel Captain
(Captain Glass) that the only steady housing area that would be
available to him was Module 11."  <u>Id.</u>  Monclova did not file any
grievances about the Module Eleven assignment when he returned in
April 2004, apparently because he preferred to work in Module
Eleven rather than "floating from one unfamiliar high
classification area to another."  Deposition of Celestino
Monclova, dated Feb. 22, 2005 ("2005 Monclova Dep.") at 66-67;
Compl. ¶ 4.  Ramos states that Monclova's assignment to Module
Eleven was made at Ramos's request and that this request was made
with Monclova's knowledge.  Ramos Dep. at 72.

On August 31, 2004, Ramos filed a request to change his work

assignment to include two days on an escort post assignment. Memo from Ramos to Warden Valerie Oliver, dated Aug. 31, 2004, attached as Bardavid Decl. Ex. F; Ramos Dep. at 80. Ramos's request was denied because this was not an available position. Rule 56.1 Statement ¶ 7. Ramos acknowledged that he was aware the escort post was not an available assignment, and that it was generally filled by people seeking overtime shifts. Ramos Dep. at 80.

On February 9, 2005, Monclova submitted a request to AMKC Warden Riordan to transfer him, Ramos and Correction Officer Bryant Miller out of Module Eleven or other "high incident areas." Monclova asked that the officers be "placed in areas where Uses of Force, and physical controversy, are minimal." Memo from Monclova to Riordan, dated Feb. 9, 2005, attached as Bardavid Decl. Ex. H. This request was not made in response to an available posting. Ramos Dep. at 128; Deposition of Celestino Monclova, dated Mar. 14, 2006 ("2006 Monclova Dep.") at 23.

At some point in February 2005, Monclova was removed from Module Eleven, although Monclova says he remained in "high classification" areas at AMKC. 2005 Monclova Dep. at 73; Rule 56.1 Statement ¶ 12. On March 2, 2005, Monclova submitted another request to Warden Riordan asking "to be assigned a steady housing area somewhere in the Dorm Projects." Memo from Monclova to Riordan, dated Mar. 2, 2005, attached as Bardavid Decl. Ex. K.

Although Monclova submitted these informal requests on multiple occasions, none of his requests were ever made in response to an available posting. 2006 Monclova Dep. at 64. Monclova apparently remained in an undesired work position when plaintiffs filed the current complaint on June 30, 2005.

On February 17, 2005, Ramos submitted another request to be reassigned out of Module Eleven to a different position with "no inmate contact . . . or no housing." Memo from Ramos to Riordan, dated Feb. 17, 2005, attached as Bardavid Decl. Ex. J. This request was denied. Rule 56.1 Statement ¶ 11.

On March 7, 2005, Ramos submitted another memo to Warden Riordan asking to be reassigned out of Module Eleven. Ramos wrote that he had worked in Module Eleven "for almost two years, and my daily tasks are becoming even more difficult, because I lost one steady officer, and the other steady officer I also rely on, I only work with for two out of my four days." Memo from Ramos to Riordan, dated Mar. 7, 2005, attached as Bardavid Decl. Ex. L. Ramos asked "to be reassigned to an available area (post) of my choosing." Id. In response, Ramos received a handwritten note from Deputy Warden Davis, also dated March 7, 2005, denying his request. Id. Davis explained that "[w]e are unable to switch your post because you feel your daily tasks are hard. When a steady post & tour becomes available and it's posted you are free to put [in] for it. If you cannot wait for that you can

go on 4 x 2 rotation until a post and tour becomes available that
you like." <u>Id.</u> Although a "4 x 2 rotation" is not clearly
defined in the record, Davis was apparently offering Ramos the
opportunity to leave his steady posting in Module Eleven in
exchange for a wheel rotation through different work assignments.
A correction officer working a "4 x 2" schedule works four days
in a row and then receives two days off, rather than having the
same two days off every week.  <u>See</u> 2006 Monclova Dep. at 16.

The next day, Ramos again submitted a written request to be
transferred, this time from Module Eleven to the "Mod 6 Corridor
security post."  Memo from Ramos to Riordan, dated Mar. 8, 2005,
attached as Bardavid Decl. Ex. M.  Ramos stated that "[d]ue to my
high level of use of force I request to be moved from a housing
area to the corridor."  <u>Id.</u>  Once again, he received a
handwritten note that same day from Davis denying the request.
Davis reiterated that Ramos could request a transfer when an
available assignment was posted, or he could "go on 4 x 2
rotation" in the meantime.  <u>Id.</u>

Three months later, on June 28, 2005, Ramos sent another
request to Warden Riordan asking to be moved out of Module Eleven
and given an escort post.  Memo from Ramos to Riordan, dated June
28, 2005, attached as Bardavid Decl. Ex. N.  Ramos asked why his
requests were being denied, and asked for copies of any documents
in his "22R (Work Record)" that might be prompting these denials.

<u>Id.</u>  Riordan sent a written response on June 29, 2005, and explained that "[i]f your current assignment is unsatisfactory to you, it is your option to either return to wheel rotation or to bid upon posted assignments you find more desirable."  Memo from Riordan to Ramos, dated June 29, 2005, attached as Bardavid Decl. Ex. O.  Riordan also informed Ramos that he could submit a request to Davis, the Deputy Warden of Administration, if he wished to view his personnel file.  <u>Id.</u>

In or about August 2005, after Ramos was involved in a second use of force incident, he was transferred out of Module Eleven.  Ramos Dep. at 152-53.  Defendants state that Ramos has been regularly assigned to the Corridor 11-12 post in AKMC since approximately January 2006, and that this current post has little to no inmate contact.  Rule 56.1 Statement ¶ 20.

## (3)

### Plaintiffs' Use of Force Incident in January 2005

On January 29, 2005,[4] plaintiffs were involved in a use of

_____

[4] The complaint alleges that the DOC issued both Ramos and Monclova disciplinary charges for a March 22, 2005 incident, "a day that neither plaintiff was on duty because it was their pass day."  Compl. ¶ 18.  The charges and specifications for Ramos reflect a January 29, 2005 incident date.  Ramos Charges and Specifications, attached as Bardavid Decl. Ex. P.  The charges and specifications for Monclova cite a March 22, 2005 incident date.  Monclova Charges and Specifications, attached as Bardavid Decl. Ex. Q.  However, both charges and specifications arise from the same incident and were prepared on the same date.  Riordan Decl. ¶ 13.  Although there is no explanation for this error in

force incident with an inmate. Pursuant to DOC regulations, an investigation immediately commenced to determine whether the use of force was justified. Decl. of Warden Brian Riordan in Support of Defs.' Mot. for Summ. J., dated Dec. 8, 2006 ("Riordan Decl."), ¶ 9. This investigation was led by Captain Marcia Harrison ("Harrison"), who was the supervisor on duty at the time of the incident. Id. ¶ 10. Pursuant to DOC protocols, Ramos and Monclova each submitted a "Use of Force Report" documenting their recollection of the incident. Id. ¶ 11. Harrison reviewed statements from Monclova, Ramos, other correction officers and inmate witnesses in preparing her report. Id. ¶ 11-12 & Ex. 2.

According to Ramos's version of events, the January 29, 2005 incident began when he observed inmate Jerome Reece "acting in a suspicious manner." Ramos Use of Force Report, dated Jan. 29, 2005, attached as Bardavid Decl. Ex. S ("Ramos Report"). Ramos stated in his "Use of Force Report" that, because of Reece's suspicious behavior, he ordered Reece out to the "bridge area" to be patted and frisked. Id. Ramos then reported that Reece "without warning or provocation" lunged at Ramos with an unidentified "contraband weapon" that had been hidden in Reece's pocket. Id. Ramos later identified the weapon he recovered as a "sharpened metal shank" approximately five inches in length.

---

the record, it is clear from the face of both documents that they refer to the same incident, which took place on January 29, 2005.

10

Riordan Decl. Ex. 2.

After Ramos knocked away Reece's weapon, Reece continued to assault Ramos. Ramos Report. Ramos responded by punching Reece and attempting to apply a rear armlock. Id. According to Ramos, Monclova returned from a personal break at this time and helped Ramos to restrain the inmate. Id. Ramos also reported that the inmate hit his face on the floor while being restrained by plaintiffs. Id. Monclova's Use of Force Report similarly states that he was returning to his post from a bathroom break when he witnessed Reece attacking Ramos, and that he then intervened to help Ramos subdue the inmate. Monclova Use of Force Report, dated Jan. 29, 2005, attached as Bardavid Decl. Ex. T.

Harrison's report, however, found inconsistencies between plaintiffs' stories and a surveillance video of the incident. Memo from Harrison to Riordan, dated Feb. 16, 2005, attached as Riordan Decl. Ex. 2. Harrison observed that "C.O. Ramos stated he called inmate Reece to the bridge area but the video clearly shows C.O. Montclova [sic] called inmate Reece out of his bed and escorted him to the bridge area." Id. Harrison's report also concluded that the use of force was unnecessary. Id. ¶ 13. Harrison noted that, according to Ramos's story, Reece had been acting suspiciously prior to the incident. Id. Harrison's report also included a statement from an inmate, Ramon Perez, who said that he had told correction officers that Reece had a sharp

object prior to the frisking and subsequent use of force. <u>Id.</u> Ex. 2. Harrison found that plaintiffs should have notified her earlier about these suspicions so that steps could have been taken to avoid the use of force. <u>Id.</u> ¶ 13. Consequently, Harrison concluded that "[t]he force used was avoidable and was anticipated," and recommended that the DOC issue both Ramos and Monclova disciplinary charges. <u>Id.</u> ¶ 13 & Ex. 2.

Assistant Deputy Warden Jesse Vann, Deputy Warden for Security Emmanuel Bailey and Warden Riordan all reviewed this report and agreed with Harrison's recommendations. <u>Id.</u> ¶¶ 14-17. The DOC decided to issue formal disciplinary charges on June 2, 2005. Riordan Decl. ¶¶ 18-19. Both plaintiffs were issued "Charges and Specifications" on May 24, 2005 for (1) utilizing and employing unnecessary and excessive force against an inmate, (2) failing to anticipate use of force and summoning a supervisor and (3) providing a false and misleading documentation of the incident. Bardavid Decl. Exs. P & Q. Plaintiffs maintain that these disciplinary charges were issued in retaliation for their opposition to defendants' unlawful employment practices. Compl. ¶¶ 15, 18.

According to Warden Riordan, the use of force package and videotape of the incident revealed that Officer Ervin Weatherl ("Weatherl") was also involved in the January 29, 2005 use of force incident. Riordan Decl. ¶ 20. Although the record does

not explain Weatherl's role in this incident, Weatherl was served
with disciplinary charges on November 18, 2005 similarly charging
him with "using impermissible force against an inmate, failing to
anticipate a use of force incident, failing to employ
alternatives to using force and submitting false and misleading
statements regarding the use of force incident."  <u>Id.</u> ¶ 21.
Defendants state that Weatherl has not filed any discrimination
or retaliation complaints against DOC as a result of these
charges.  Rule 56.1 Statement ¶ 41.

## Discussion

### (1)

### Summary Judgment Standard

To succeed on a summary judgment motion, the moving party
must demonstrate that there is "no genuine issue as to any
material fact and that the moving party is entitled to judgment
as a matter of law."  Fed. R. Civ. P. 56(c).  When making this
determination, a court must "resolve all ambiguities and draw all
factual inferences in favor of the nonmoving party."  <u>McClellan</u>
<u>v. Smith</u>, 439 F.3d 137, 144 (2d Cir. 2006).  But a nonmoving
party cannot defeat a summary judgment motion merely through
"conclusory statements, conjecture, or speculation."  <u>Woodman v.</u>
<u>WWOR-TV, Inc.</u>, 411 F.3d 69, 85 (2d Cir. 2005).  Mere allegations
of discrimination that are "devoid of any specifics, but replete

13

with conclusions" will not defeat a motion for summary judgment. <u>Bickerstaff v. Vassar Coll.</u>, 196 F.3d 435, 452 (2d Cir. 1999).


**(2)**

**Title VII Claim**

Plaintiffs allege that defendants retaliated against them for their prior lawsuits by refusing to transfer them to a position where they would be less likely to be involved in a use of force incident. Compl. ¶ 15. Plaintiffs allege that by keeping them assigned to a high incident area, defendants have jeopardized their safety and tarnished their employment records. <u>Id.</u> ¶ 17. Plaintiffs also claim that the disciplinary charges resulting from the January 29, 2005 incident were retaliatory. <u>Id.</u> ¶ 18.

Title VII prohibits employers from retaliating against employees who oppose an unlawful employment practice. 42 U.S.C. § 2000e-3(a). Courts analyze retaliation claims under the <u>McDonnell Douglas</u> burden-shifting framework. <u>Coffey v. Dobbs Int'l Serv., Inc.</u>, 170 F.3d 323, 326 (2d Cir. 1999) (citing <u>McDonnell Douglas Corp. v. Green</u>, 411 U.S. 792, 802-04 (1973)). Under this framework, plaintiffs have the initial burden of making out a prima facie retaliation claim. The burden then shifts to defendants to provide a valid and non-discriminatory basis for their actions. If defendants meet this burden, then

the burden shifts to plaintiffs to show that this explanation is merely a pretext for discrimination. <u>Terry v. Ashcroft</u>, 336 F.3d 128, 141 (2d Cir. 2003)

Plaintiffs fail to establish a prima facie case of retaliation. Even if they could, defendants have provided an uncontroverted and non-pretextual basis for refusing to transfer plaintiffs and for issuing disciplinary charges against them. Therefore, defendants are granted summary judgment on all claims.[5]

## A. Plaintiffs Fail to Establish a Prima Facie Case

To establish a prima facie case of retaliation, plaintiffs must show that: (1) they engaged in a protected activity known to defendants; (2) defendants engaged in an adverse employment action against plaintiffs; and (3) there was a causal connection between the protected activity and the adverse employment action. <u>Patane v. Clark</u>, 508 F.3d 106, 115 (2d Cir. 2007).

Plaintiffs' prior lawsuits satisfy the first prong of this test. As noted above, both Monclova and Ramos previously filed complaints against the DOC claiming that the DOC subjected them to discriminatory employment practices. Monclova filed his

---

[5] It should also be noted that individuals are not subject to liability under Title VII. <u>Patterson v. County of Oneida</u>, 375 F.3d 206, 221 (2d Cir. 2004). Therefore, plaintiffs' Title VII claims against individual defendants Riordan, Duffy and Davis are dismissed for that reason as well.

earlier complaint on July 19, 2004, and Ramos filed his earlier
complaint on January 14, 2005. These complaints, if made
reasonably and in good faith, are protected activities for the
purposes of a retaliation action, even if plaintiffs' prior
discrimination suits were unsuccessful. <u>Wimmer v. Suffolk County
Police Dep't</u>, 176 F.3d 125, 134 (2d Cir. 1999) ("To establish the
first of these elements -- participation in a protected activity
-- [plaintiff] need not prove that the conditions against which
he protested actually amounted to a violation of Title VII.
Rather, [plaintiff] must demonstrate only that he had a good
faith, reasonable belief that the underlying challenged actions
of the employer violated the law." (internal quotations and
citations omitted)). There is no evidence that plaintiffs'
earlier complaints were not filed in good faith, and defendants
do not contest this issue. Therefore, the prior lawsuits will be
considered protected activities for the purpose of plaintiffs'
prima facie case.

Plaintiffs also succeed on the second prong because they can
show that defendants subjected them to an adverse employment
action. "To prevail on a claim for retaliation under Title VII,
'a plaintiff must show that a reasonable employee would have
found the challenged action materially adverse, which in this
context means it well might have dissuaded a reasonable worker
from making or supporting a charge of discrimination.'" <u>Kessler</u>

v. Westchester County Dep't of Soc. Serv., 461 F.3d 199, 207 (2d
Cir. 2006) (quoting Burlington Northern & Santa Fe Ry. v. White,
548 U.S. 53, 126 S. Ct. 2405, 2415 (2006)).  Plaintiffs cite
defendants' refusal to transfer them to a safer work environment,
and the disciplinary charges that were issued in June 2005, as
adverse employment actions.  Both are sufficient to satisfy this
prong for a prima facie case of retaliation.

     The parties agree that plaintiffs made multiple transfer
requests.  Plaintiffs state that they sought reassignment to
safer and less violent work environments.  Compl. ¶ 12.
Plaintiffs allege that defendants' refusal to transfer them was
"retaliatory" because it was prompted by frustration over
plaintiffs' previous lawsuits.  Id. ¶ 15.  Plaintiffs also argue
that the refusal to transfer them to new assignments has been
"jeopardizing their physical safety, as well as promotional
opportunities, and possibly even their livelihoods," due to the
high risk that they will be involved in violent incidents with
inmates.  Id. ¶ 14.  Such claims are sufficient to allege an
adverse employment action.  See Meckenberg v. N.Y. City Off-Track
Betting, 42 F. Supp. 2d 359, 378 (S.D.N.Y. 1999) (finding that
"the denial of a request for transfer to departments where
conditions were more favorable constitutes an adverse action").

     The June 2005 disciplinary charges against plaintiffs are
also an adverse employment action for the purpose of making out a

prima facie case of retaliation.  At the time this motion was briefed, these charges had not led to any additional disciplinary actions or suspensions against plaintiffs.  Rule 56.1 Statement ¶ 39.  Nonetheless, charges of this sort can have significant future consequences for employment and could reasonably dissuade an employee from raising a claim of discrimination.  Therefore, the disciplinary charges are also sufficient to meet this prong of the prima facie test.  See Meder v. City of New York, No. 06-CV-504, 2007 WL 2937362, at *11 (E.D.N.Y. Oct. 9, 2007) (finding that complaints and reprimands were "materially adverse actions" under the Burlington Northern standard for a Title VII retaliation claim); Malone v. City of New York, No. CV-05-2882, 2006 WL 2524197, at *8 (E.D.N.Y. Aug. 30, 2006) (finding that disciplinary charges were a materially adverse action in a Title VII retaliation claim).

However, plaintiffs fail to establish a prima facie case because they cannot meet the third prong, requiring them to show a causal link between the protected activity and adverse employment action.  "A causal connection between the adverse action and the protected activity, is established where a plaintiff offers[:] (1) direct proof of retaliatory animus directed against the plaintiff, (2) disparate treatment of similarly situated employees, or (3) that the retaliatory action occurred close in time to the protected activities."  Hunter v.

18

St. Francis Hosp., 281 F. Supp. 2d 534, 547 (E.D.N.Y. 2003)

(citing McNair v. NYC Health & Hospital Co., 160 F. Supp. 2d 601,

604 (S.D.N.Y. 2001)).  Plaintiffs offer no direct proof of

retaliatory animus.  Indeed, plaintiffs have failed to offer any

evidence at all for their claims, other than their own

allegations and alleged hearsay statements made by unidentified

persons.  See, e.g., Compl. ¶ 16.  It is well settled that mere

conclusory allegations of discrimination are insufficient to

survive summary judgment.  See Bickerstaff v. Vassar Coll., 196

F.3d 435, 448 (2d Cir. 1999).  Plaintiffs also offer no evidence

that other similarly situated officers have been permitted to

transfer to new work assignments after making similar requests,

or that other officers have not been disciplined after similar

use of force incidents.  Therefore, the only way that plaintiffs

can establish causation is through an inference created by the

temporal proximity between their protected activity and an

adverse action.

For a plaintiff to rely solely on temporal proximity to

establish a prima facie case requires a "very close" temporal

relationship between the protected activity and the adverse

treatment.  Hunter, 281 F. Supp. 2d at 547 (citing Clark County

Sch. Dist. v. Breeden, 532 U.S. 268, 273 (2001)).  The Second

Circuit "has not drawn a bright line to define the outer limits

beyond which a temporal relationship is too attenuated to

establish a causal relationship between the exercise of a federal
constitutional right and an allegedly retaliatory action."
Gorman-Bakos v. Cornell Coop. Extension, 252 F.3d 545, 554 (2d
Cir. 2001).  But district courts have suggested that, in the
absence of other evidence suggesting retaliation, a delay of two
to three months is the most that can support an inference of
causation.  See Woods v. Enlarged City Sch. Dist., 473 F. Supp.
2d 498, 529 (S.D.N.Y. 2007) (collecting cases); Cunningham v.
Consol. Edison, Inc., No. CV-03-3522, 2006 WL 842914, at *19
(E.D.N.Y. Mar. 28, 2006) (reviewing cases to conclude that "a
passage of two months between the protected activity and the
adverse employment action seems to be the dividing line").

    Monclova fails to establish an inference of causation
because the lapse in time between the filing of his prior
complaint on July 19, 2004 and the adverse events cited in
plaintiffs' complaint is too long to infer a causal link.  Almost
seven months passed between Monclova's prior complaint and his
first transfer request of February 9, 2005.  Almost eleven months
passed between Monclova's prior complaint and the June 2005
decision to issue Monclova disciplinary charges.  Because
Monclova cannot establish a causal connection between his
protected activity and any adverse employment actions, he cannot
establish a prima facie case of retaliation.

    Ramos similarly fails to establish a causal connection,

although his case is closer.  Ramos previously sued the DOC on
January 14, 2005.  Ramos received disciplinary charges in June
2005, at the same time as Monclova, and five months after he
filed his complaint.  This is too large a gap in time to infer
causation.  However, the DOC denied Ramos's February 9, 2005
transfer request less than one month after he filed his prior
complaint.  On its own, this one-month lapse between Ramos's
complaint and the denial of his transfer request could
potentially create an inference of causation.

However, Ramos had previously requested to change his work
assignment from Module Eleven to an intake post on August 31,
2004.  Bardavid Decl. Ex. F.  This request was denied because the
intake post was not an open post.  This denial took place four-
and-a-half months before Ramos filed his January 14, 2005
discrimination complaint.  Defendants correctly argue that such
evidence of prior adverse actions, which preceded the protected
activity and could not have been retaliatory, can defeat the
inference of causation, so long as defendants' actions remained
consistent before and after the protected activity took place.
See Slattery v. Swiss Reinsurance America Corp., 248 F.3d 87, 95
(2d Cir. 2001) (affirming denial of summary judgment on
retaliation claim, and holding that "[w]here timing is the only
basis for a claim of retaliation, and gradual adverse job actions
began well before the plaintiff had ever engaged in any protected

activity, an inference of retaliation does not arise").

The record shows that defendants consistently refused Ramos's transfer requests, before and after he filed his discrimination complaint. These refusals were consistently based on Ramos's repeated failure to heed his employer's requirement that he make such requests in response to available postings. Defendants have, therefore, defeated any inference of causation created by temporal proximity. Accordingly, Ramos fails to establish a prima facie case. See Slattery, 248 F.3d at 95; Stroud v. New York City, 374 F. Supp. 2d 341, 352 (S.D.N.Y. 2005); Hunter, 281 F. Supp. 2d at 547.

**B.  Defendants Offer Legitimate, Non-Retaliatory Reasons for the Alleged Adverse Employment Actions**

Even if plaintiffs could establish a prima facie case of retaliation, defendants have met their burden under the McDonnell-Douglas test of establishing a valid and non-retaliatory basis for their actions.

Defendants denied plaintiffs' transfer requests because plaintiffs failed to follow the procedures for requesting a reassignment and refused to apply for positions that were actually available. DOC provides clear guidelines and procedures to follow for reassignment to ensure "equity in the selection process when awarding job assignments to members of the uniformed force." Operations Order No. 14/91, attached as Bardavid Decl.

22

Ex. R.  Plaintiffs both admit that they failed to follow these
procedures.  In addition, defendants repeatedly reminded
plaintiffs that they could either apply for available postings or
take assignments on the wheel rotation.  Because plaintiffs
failed to follow these procedures, defendants continued to deny
their requests.

The City also articulates a legitimate, non-retaliatory
reason for issuing disciplinary charges.  The DOC has strict
rules and regulations regarding the use of force against inmates,
including several steps that officers must follow prior to using
force.  Riordan Decl. ¶ 2.  DOC Directive 5006R-A provides:

> Whenever the use of force is anticipated and the inmate
> does not pose an immediate threat, a supervisor shall
> be notified and all actions shall be under his/her
> direction.  In an emergency or situation where it is
> not possible or practical to notify a supervisor, staff
> may use appropriate force consistent with the
> procedures contained herein.

DOC Directive 5006R-A, attached as Riordan Decl. Ex. 1, at 2.
Defendants found that plaintiffs used force against an inmate in
violation of this regulation.  Defendants also found that
plaintiffs inaccurately documented their use of force during the
follow-up investigation.  The DOC has a compelling interest in
regulating the use of force against inmates, and in protecting
the integrity of its investigative procedures.  Disciplining
plaintiffs for unnecessarily using force against an inmate, and
then submitting false and misleading reports about the incident,

is entirely appropriate under these circumstances.

## C.    Plaintiffs Fail to Provide Evidence of Pretext

Because defendants establish a non-retaliatory reason for
their actions, the burden shifts back to plaintiffs to
demonstrate that the employer's stated reason is merely
pretextual and that the adverse employment action was actually
discriminatory.  <u>Johnson v. County of Nassau</u>, 480 F. Supp. 2d
581, 593 (E.D.N.Y. 2007) (citing <u>Reeves v. Sanderson Plumbing
Prods., Inc.</u>, 530 U.S. 133, 143 (2000)).  Although the burdens of
proof shift back and forth under the <u>McDonnell Douglas</u> framework,
the ultimate burden of proof of showing discrimination remains at
all times with the plaintiff.  <u>Id.</u>

Plaintiffs' opposition brief asserts that they have made out
a prima facie case of retaliation, but does not provide any clear
arguments for why the City's proffered explanations are
pretextual.  Nevertheless, since plaintiffs are <u>pro se</u>, their
complaint and opposition papers will be reviewed for any viable
claims of pretext.

First, plaintiffs claim that defendants are punishing them
for the hassle of addressing their prior lawsuits.  Plaintiffs
claim that they have both "been told by other supervisors that
their command is seeking reprisal because of the frustration they
have to endure gathering documents to satisfy discovery request,

concerning their pending lawsuits." Compl. ¶ 15. However, the record offers no specific facts about these statements. Plaintiffs' allegations that unnamed supervisors made these statements are insufficient to defeat summary judgment. <u>See Schwapp v. Town of Avon</u>, 118 F.3d 106, 111-12 (2d Cir. 1997) (holding that a non-moving party must offer "concrete particulars" rather than "conclusory allegations" to defeat summary judgment).

Second, plaintiffs claim that defendants Riordan and Duffy are members of the Emerald Society.[6] Compl. ¶ 16. Plaintiffs believe that defendants, due to their shared membership in this Society, must have "heavily discussed" their "knowledge and resentment of both plaintiffs." Pls.' Opp'n at 3. But there is no evidence to support this allegation. Furthermore, plaintiffs fail to explain why membership in the Emerald Society would be evidence of intentional discrimination.

Because the record provides no evidence to show that the

---

[6] The New York State Corrections Emerald Society website shows that it is a private membership organization for Irish-American correction officers. <u>See</u> New York State Corrections Emerald Society website, http://www.nysces.org/index.html (last visited March 19, 2008).

    Plaintiffs also allege that Deputy Warden Timothy Reilly ("Reilly"), an Executive Officer for the DOC Emergency Services Unit ("ESU"), is a member of the Emerald Society who has conspired with defendants Duffy and Riordan. Compl. ¶ 16. In Monclova's earlier lawsuit, he claimed that the ESU unfairly dismissed him from training. <u>See</u> Monclova I Compl. Plaintiffs do not name Reilly as a defendant in this current suit.

City's legitimate, non-retaliatory reasons are pretextual,
defendants are granted summary judgment on all of plaintiffs'
Title VII retaliation claims.


**(3)**

**Section 1983 Claim**

To prevail under § 1983, plaintiffs must allege that
defendants, while acting under color of state law, deprived them
of rights guaranteed by either the Constitution or other federal
laws.  42 U.S.C. § 1983.  Plaintiffs claim that "[r]etaliation is
shown because the defendants violated [§ 1983] by refusing the
plaintiffs the same fair and equal treatment they are mandated to
give all individuals who have worked stead[ily] in severely high
incident jail house locations."  Pls.' Opp'n at 4.  Plaintiffs
further allege that defendants violated § 1983 because:

> To show consideration for [plaintiffs'] best interests
> defendants are supposed to house them in lower
> classification areas, so that their use of force record
> does not misleadingly reveal that they encounter
> physical confrontation more than the average officers
> who are either sheltered from guarding high profile
> inmates, or whose schedules do not permit them to
> encounter high profile inmates on a frequent basis.
> These actions by the defendants limit the plaintiffs'
> job effectiveness and limit their abilities to move up
> in rank throughout the department.

Id.

Plaintiffs appear to believe that defendants violated their
equal protection rights by denying them the same treatment as

other DOC employees, and that defendants were motivated by unlawful retaliatory animus. This § 1983 equal protection claim is analyzed using the same McDonnell-Douglas framework and the same substantive standards as plaintiffs' Title VII retaliation claim. See Demoret v. Zegarelli, 451 F.3d 140, 149 (2d Cir. 2006); Patterson v. County of Oneida, 375 F.3d 206, 225 (2d Cir. 2004); Jemmott v. Coughlin, 85 F.3d 61, 67 (2d Cir. 1996).

As explained above, plaintiffs have failed to establish a prima facie case of discriminatory retaliation under Title VII, and defendants have provided legitimate and non-pretextual explanations for any adverse employment actions taken against plaintiffs. For these same reasons, defendants are entitled to summary judgment on plaintiffs' § 1983 claims.[7]

---

[7] Because defendants are entitled to summary judgment on plaintiffs' § 1983 claim, there is no need to consider whether the individual defendants are entitled to qualified immunity, or whether the City defendants have shown that municipal liability cannot attach.

## Conclusion

For the foregoing reasons, defendants' motion for summary judgment is granted on all counts. All claims are dismissed with prejudice. The Clerk of the Court is directed to close this case.


Dated: Brooklyn, New York
      March 26, 2008

                                     SO ORDERED:


                               _____/s/_____
                               David G. Trager
                               United States District Judge